**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **A.A.**, **B.B.**; **C.C.**, a minor, by **JENNY CARROLL**, his Next Friend; **D.D.**, a minor, by **CHRISTINE FREEMAN**, his Next Friend; **E.E.**, a minor, by **CHRISTINE FREEMAN**, her Next Friend; **F.F.**, a minor, by **CHRISTINE FREEMAN**, her Next Friend; and **G.G.**, a minor, by **CHRISTINE FREEMAN**, her Next Friend, | Civil Action No.: 2:21-cv-367-ECM |
| **Plaintiffs,** | |
| v. | **SECOND AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **NANCY T. BUCKNER**, Commissioner of the Alabama Department of Human Resources, in her official capacity, | |
| **Defendant.** | |

**INTRODUCTION**

1.     The Alabama Department of Human Resources and its Commissioner Nancy T. Buckner in her official capacity (collectively, "DHR") discriminate against foster children and youth with mental impairments by unnecessarily segregating them in restrictive, institutional placements known as psychiatric residential treatment facilities ("PRTFs") in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. §§ 794 *et seq.*; and their implementing regulations.

2.     DHR is legally obligated to administer its services, programs, and activities to children with mental impairments in the most integrated setting appropriate to their needs, 28

C.F.R § 35.130(d), and is prohibited from unjustifiably institutionalizing and segregating children in PRTFs, 42 U.S.C § 12132.

3.  PRTFs are non-hospital facilities that provide inpatient mental health services to children, including Medicaid-eligible individuals under the age of 21. DHR's criteria for placing a child in a PRTF requires that the child have a DSM-V "diagnosed mental illness or be identified by a mental health professional as having serious emotional and/or behavioral problems and be in need of treatment in a highly-structured, therapeutic environment. These problems must pose a severe level of impairment to overall functioning in multiple areas."

4.  DHR contracts with 19 PRTFs across the state to provide children in foster care with mental health treatment. DHR refers to its network of contracted PRTFs as "Intensive" placements and these 19 PRTFs are collectively able to provide housing for up to 500 children in foster care.

5.  PRTFs are highly restrictive facilities that isolate youth from their families, friends, and communities.

6.  PRTFs should only be used as a last resort to provide short-term, inpatient therapeutic treatment to children with mental health needs when the placement is necessary to treat the child's condition. *See* 42 C.F.R. § 441.152(a).

7.  Research shows that children placed in PRTFs experience life outcomes far worse than their non-institutionalized peers, such as languishing in care for longer than medically necessary, being less likely to be placed with their siblings, and experiencing higher rates of maltreatment in care.

8.  In some instances, children's conditions are further exacerbated, not improved, by residential care.

9. Despite the known harm posed by PRTFs, DHR oversees, contracts with, and depends on its network of PRTFs across Alabama to confine hundreds of children and youth in foster care with mental impairments, some as young as 12 years old. Many of these youth's needs could be reasonably accommodated in their communities.

10. Many more children and youth in DHR's custody are at serious risk of unnecessary confinement in PRTFs.

11. Black youth in DHR's custody face a higher risk of unnecessary confinement because DHR disproportionately places Black children in these facilities. Forty-one percent of Black children in foster care with a diagnosed emotional disturbance, a subset of children with mental impairments, are placed in residential facilities while only 31.2% of their non-Black peers with an emotional disturbance are placed there.

12. DHR admits that it has long over-relied on institutional placements because it lacks sufficient community-based alternatives, describing its "dependence on congregate facilities" and its need to recruit and retain well-trained foster and adoptive resource families.

13. DHR spends significant taxpayer dollars funding expensive, institutional placements instead of foster and relative care.

14. The cost of institutional care to agencies and taxpayers can be seven to ten times more expensive than caring for a child in a family setting.

15. Plaintiffs A.A., B.B., C.C., D.D., E.E., F.F., and G.G.[1] are youth with mental impairments in DHR's custody who have been removed from their families and communities and have been, are currently placed in, or are at risk of placement in a PRTF.

---

[1] Because F.F. and G.G. are minors, they will be proceeding using pseudonymous initials as allowed by the Court's Order dated June 9, 2021 (Doc. 10). Plaintiffs will file an updated reference list with the Court.

16.     Plaintiffs have spent most of their adolescence confined to these facilities.

17.     Plaintiffs bring this action on behalf of themselves and other similarly situated children to challenge the significant harm they have suffered because of DHR's needless institutionalization of children and youth with mental impairments in foster care.

18.     Plaintiffs, like other children confined to PRTFs, are and were denied essential opportunities for healthy development, like living in a loving, supportive, family or family-like setting, building intimate relationships with trusted adults, exploring chosen passions and hobbies, and developing necessary independent living skills. They are and were also denied educational, employment, and social opportunities with their nondisabled peers.

19.     The harm caused by institutionalization is exacerbated by the dangerous, dirty, and violent conditions that DHR has allowed to persist within some PRTFs.

20.     Children in these facilities have been subjected to assaults, restraints, psychologically abusive punishments, and filthy living conditions.

21.     DHR systemically fails to plan, develop, and administer a child and family support program to ensure that children and youth in foster care are cared for in the most integrated setting appropriate to their needs.

22.     DHR systemically fails to ensure that children and youth in foster care with mental impairments are only placed in a PRTF if their needs cannot be met in a more integrated setting.

23.     DHR systemically fails to ensure that children placed in PRTFs are timely and appropriately discharged.

24.     Through this action, Plaintiffs seek injunctive and declaratory relief to remedy DHR's ongoing statutory violations on behalf of a class of children who are entitled to be safely cared for in their communities.

**JURISDICTION AND VENUE**

25.     This action arises under Title II of the ADA, 42 U.S.C. §§ 12101 *et seq.*, and Section 504 of the RA, 29 U.S.C. § 794. Plaintiffs' claims are authorized by 42 U.S.C. § 12133 and 29 U.S.C. § 794(a).

26.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction). Declaratory relief in this case is authorized by 28 U.S.C. §§ 2201 & 2202.

27.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because DHR and its Commissioner maintain their principal office within this district in Montgomery, Alabama and the acts and omissions giving rise to this action occurred in the Middle District of Alabama.

**PARTIES**

**I.     Named Plaintiffs and Next Friends**

**A.  Plaintiff A.A.**

28.     When the original complaint in this action was filed, A.A. was a 17-year-old African American female with a mental impairment that substantially limits one or more major life activities.

29.     At the time of filing, A.A. had a documented history of verbal and physical aggression, and a documented need for therapy for her tendency to self-harm and act out because of anger.

30.     After A.A. was born, her mother transferred her custody to a family friend of A.A.'s with whom A.A. lived.

31.     A.A. was taken into custody by DHR in 2016, at the age of twelve, after she alleged that a member of the custodial family had sexually abused her.

32.     Except for very brief placements when she first entered care, A.A. was confined to and shuffled between three PRTFs for the first five years she was in DHR's custody—one for eighteen months, another for eight months, and another for almost two-and-one-half years. When this action was filed, A.A was confined to a PRTF.

33.     DHR only places youth with mental impairments that substantially limit one or more major life activities in a PRTF. Thus, by placing A.A. in PRTFs, DHR regarded her as such a youth.

34.     Throughout her childhood, A.A. has wanted to live with a family in the community, attend high school like other youth her age, talk on the telephone, and socialize with friends. She has wanted to be a cheerleader, learn to play the piano, and learn to cook. She has also wanted to go skating, even though it scares her.

35.     Instead, A.A. lived in isolated and restrictive PRTFs where her life was extremely regimented, and she could not do typical teenage activities and develop her independence. She was restricted from attending school in the community or engaging in any community-based hobbies or extracurricular activities.

36.     A.A.'s ability to progress in and ability to exit from her PRTF placement hinged, in large measure, on her ability to advance through the program's "level system"—a one-size-fits-all behavior management system used by many PRTFs that is arbitrary, punitive, and non-therapeutic.

37.     A.A.'s progress through the level system was often slowed for such minor behaviors as "laughing when she is not supposed to," "standing at her bedroom door," and "being playfully defiant."

38.    At one PRTF, A.A. was also subjected to an emotionally abusive disciplinary practice called Group Ignorance (GI) for almost a year, causing her significant emotional pain and distress.

39.    GI is institutionalized shunning.

40.    As described by the PRTF's student handbook, residents on GI were "not approved to interact with peers" and "[are] required to remain 10-ft from all residents at all times."

41.    Residents on GI could interact with peers only during the provision of billable services like basic living skills instruction and therapist-led group therapy.

42.    Residents on GI were not allowed to engage in "small talk" with staff. Even their therapeutic discussions with staff were required to "be minimal—only enough to support/encourage the resident."

43.    When other girls were in the facility's common area to play games or watch TV, girls on GI were forced to sit in a chair facing the wall.

44.    Residents who interacted with an individual on GI risked being placed on GI themselves.

45.    While subject to GI, residents were further punished by being denied the ability to advance through the level system, which is required to exit the PRTF.

46.    In August 2020, PRTF records indicated that DHR determined A.A. was ready to be moved to a less restrictive setting. Still, A.A. was not moved until the end of May 2021.

47.    Because of DHR's systemic failures to provide adequately supported community-based placements and services, A.A. remained at serious, imminent risk of being returned to a PRTF.

48.     A mental health treatment professional has determined that A.A. was eligible for a community-based placement with appropriate services while placed in PRTFs and that she remains eligible.

49.     For example, A.A.'s move between multiple PRTFs and lengthy stays in PRTFs suggest that she was not provided supported, appropriate community-based placements.

50.     A.A. originally brought this action through her next friend, Jenny Carroll.

51.     Jenny Carroll is the Wiggins, Childs, Quinn, and Pantazis Professor of Law at The University of Alabama School of Law, where she specializes in criminal law. She previously worked as a juvenile public defender and represented indigent defendants in mental health matters in adult and juvenile court.

52.     Professor Carroll is familiar with the facts of A.A.'s case as well as the harms and risk of harm A.A. has suffered while in DHR's custody. She is dedicated to serving A.A.'s best interest in this litigation.

**B.  Plaintiff B.B.**

53.     When the original complaint in this action was filed, B.B. was an 18-year-old Hispanic female who has a mental impairment that substantially limits one or more major life activities. She has been diagnosed with major depression and conduct disorder. She is the victim of chronic sexual abuse by her father. B.B. was also eligible for special education services.

54.     B.B. was placed in a PRTF by DHR in late 2019 and lived there until May 2021. She was then moved between multiple placements until she ran away in August 2021.

55.     In 2003, when B.B. was one year old, her mother, who struggled with substance use disorder, had her parental rights terminated. B.B. and her brother continued to live with their father, often experiencing periods of homelessness.

56.     In 2016, when she was fourteen years old, DHR took custody of B.B. after she reported being sexually assaulted by the son of the family with whom she and her family were staying.

57.     In 2019, her father's parental rights were terminated.

58.     From 2016 to 2021, B.B. lived in two highly restrictive and segregated PRTF placements for more than three of the five years that she was in DHR's custody.

59.     In November 2020, PRTF records indicated that B.B. could be supported in a less restrictive level of care. However, she remained at a PRTF until May 2021 and was in a PRTF placement at the time the original complaint in this action was filed.

60.     DHR only places youth with mental impairments that substantially limit one or more major life activities in a PRTF. Thus, by placing B.B. in a PRTF, DHR identified her as such a child.

61.     Because of DHR's systemic failures to provide appropriately supported community-based placements and services, B.B. was at serious, imminent risk of being returned to a PRTF.

62.     B.B. likes to sing and wanted to be in a high school choir if she had the chance to go to a traditional school. She thinks she would have been an alto. B.B. didn't get a chance to ride a bike and wanted to. She also wanted to go to prom.

63.     Instead, B.B. was denied all these and other such opportunities because of her placement in a PRTF, where her life activities were extremely limited and regimented. She was restricted from attending school in the community or engaging in any community-based hobbies or extracurricular activities—those developmentally appropriate and typical activities that other teenagers regularly do to foster independence. B.B. was not able to develop relationships with

friends of her choosing, only with her fellow resident facility peers; she did not have the opportunity to get a part time or summer job, and she never learned to drive or navigate public transit.

64.     While she was in a PRTF, B.B. wanted to move to a foster home. She wanted to graduate high school and go to college to study child development.

65.     A mental health treatment professional has determined that B.B. was eligible for a community-based placement with appropriate services while placed in a PRTF and that she remains eligible.

66.     For example, B.B. had strong family ties that were disrupted by her placement in the PRTF and has a history of functioning well in public school with an appropriate individualized education plan—all of which indicate that she would have been capable of living in a supported, appropriate community-based placement.

## C.  Plaintiff C.C.

67.     When the original complaint in this action was filed, C.C. was a 14-year-old African American male who has been diagnosed with mental and physical impairments that substantially limit one or more major life activities. He has been diagnosed with opposition defiant disorder, PTSD, and ADHD. He is also a victim of sexual abuse.

68.     At the time of filing, C.C. had spent a majority of the last five years in PRTFs.

69.     DHR removed him from his grandmother's home in 2016, where he lived since the death of his mother.

70.     C.C. was placed in a PRTF in March 2019.

71.     DHR only places youth with mental impairments that substantially limit one or more major life activities in a PRTF. Thus, by placing C.C. in a PRTF, DHR regarded him as such a youth.

72.     In May 2020, the facility provided DHR with a 45-day discharge notice, stating that C.C. had reached the maximum benefit of their programming.

73.     The facility recommended a less restrictive, more integrated placement for C.C.

74.     In September 2020, the facility once again notified DHR that C.C. was due to be discharged.

75.     In the September 2020 notice, the facility emphasized that due to C.C.'s increasing negative behaviors including "verbal antagonization, physical aggression, and defiance" the facility's treatment team had changed its recommendation from a lesser restrictive placement to a "lateral placement."

76.     The facility reminded DHR that C.C.'s "original discharge date of June 19, 2020, remains intact, meaning that he is now three months past his established date. Please seek placement as soon as possible."

77.     In late 2021, C.C. was moved to live with his uncle in Texas. After C.C.'s uncle died in May 2022, DHR placed C.C. in a PRTF facility in Georgia, where he remains to this day.

78.     Because of his continuing segregation and DHR's systemic failures to provide appropriately supported community-based placements and services, C.C. remains institutionalized in a restrictive PRTF placement.

79.     While at his PRTF placements, C.C. has been restricted from attending school in the community or engaging in any community-based hobbies or extracurricular activities. He has

had few opportunities to leave the facility or engage in typical teenage activities like community sports teams, shopping, eating at restaurants, and going to movies and concerts.

80.     A mental health treatment professional has determined that C.C. was eligible for a community-based placement with appropriate services while placed in PRTFs and that he remains eligible.

81.     A primary reason for C.C.'s continued residence in an institutional placement is the lack of supported placements and services in the community that provide care for his needs. C.C. is not being provided individualized services, but is mired in a pre-established behavior management program that does not recognize his needs.

82.     C.C. initially brought this action through his uncle serving as his next friend.

83.     Because his uncle passed away, C.C. now brings this action through his next friend, Jenny Carroll. This Court appointed Professor Carroll as C.C.'s next friend on March 31, 2023.

84.     Professor Carroll is familiar with the facts of C.C.'s case as well as the harms and risk of harm C.C. has suffered while in DHR's custody. She is dedicated to serving C.C.'s best interest in this litigation.

**D.  Plaintiff D.D.**

85.     When the original complaint in this action was filed, D.D. was a 16-year-old white male who has been diagnosed with mental and physical impairments that substantially limit one or more major life activities. He has been diagnosed with childhood conduct disorder, anxiety, and OCD. He takes medication for depression and ADHD.

86.     D.D. was admitted to a PRTF in 2017 for treatment after allegedly inappropriately touching a sibling.

87.     D.D. completed treatment at that PRTF and was transferred to another PRTF placement in 2018, even though a psychologist recommended him for treatment in the community.

88.     Because of his continuing segregation and DHR's systemic failures to provide appropriately supported community-based placements and services, D.D. remains institutionalized and is at serious, imminent risk of being returned to an even more restrictive PRTF placement.

89.     D.D. has spent a significant portion of his life in PRTF placements.

90.     DHR only places youth with mental impairments that substantially limit one or more major life activities in a PRTF. Thus, by placing D.D. in a PRTF, DHR regarded him as such a youth.

91.     D.D. has been unnecessarily segregated from the community and denied the opportunity to live in a family-like setting.

92.     D.D.'s life in PRTFs was extremely regimented. His current placement continues to restrict him from doing typical activities like other teenagers to promote independence.

93.     D.D. likes being in school and enjoys English and Science. However, living in a PRTF, he was not in a community school. Further, he was restricted from engaging in any community-based hobbies or extracurricular activities, having few opportunities to leave the facility or engage in typical teenage activities. He enjoys video games but had limited access to such activities in the PRTF.

94.     A mental health treatment professional has determined that D.D. was eligible for a community-based placement with appropriate services while placed in PRTFs and that he remains eligible.

95.     While in the PRTF, D.D. did not have the opportunity to remain in school, be treated in his home community, or maintain safe contact with his family. An assessing psychologist

recommended in 2018 that D.D. receive outpatient treatment in community-based therapeutic foster care.

96.     D.D. brings this action through his next friend, Christine Freeman.

97.     Ms. Freeman is the Executive Director of the Middle District of Alabama Federal Defender Program and the Alabama Post-Conviction Relief Project. She previously served on the board of the Alabama affiliate of the American Civil Liberties Union and is the current president of the Board of Alabama Appleseed Center for Law and Justice.

98.     Ms. Freeman is familiar with the facts of D.D.'s case as well as the harms and risk of harm D.D. has suffered in DHR's custody. Ms. Freeman is dedicated to serving D.D.'s best interests in this litigation.

**E. Plaintiff E.E.**

99.     When the First Amended Complaint in this action was filed, adding E.E. as a named plaintiff, E.E. was a 16-year-old Caucasian girl who has mental and physical impairments that substantially limit one or more major life activities. She has been diagnosed with PTSD and ADHD. E.E. is also the victim of incest and sexual, verbal, and physical abuse.

100.     E.E. was placed in the custody of her maternal grandmother when E.E.'s mother became unemployed and homeless.

101.     E.E., her twin sister, and her other siblings were placed in DHR's custody in December 2019. Since that time, as of the filing of the First Amended Complaint, E.E. lived in hospital or residential facilities, apart from three short stays with foster families.

102.     E.E. was placed in a PRTF in December 2020 and was in a PRTF placement at the time of filing the First Amended Complaint in this action.

103. DHR only places youth with mental impairments that substantially limit one or more major life activities in a PRTF. Thus, by placing E.E. in a PRTF, DHR regarded her as such a youth.

104. E.E.'s ability to progress in and ability to exit from her PRTF placement hinged, in large measure, on her ability to advance through the program's "level system"—a one-size-fits-all behavior management system used by many PRTFs that is arbitrary, punitive, and non-therapeutic.

105. E.E.'s progress through the level system has been slowed for such minor behaviors as "bartering and trading," giving a pen to another girl, and other minor disciplinary matters.

106. E.E. has been unnecessarily segregated from the community and her siblings and denied the opportunity to live in a family-like setting. While she was in the PRTF, she wished to return home to live with her mom.

107. While she lived in a PRTF, E.E. was unable to attend a community school. She could not do typical teenage activities, like use social media or a smartphone, nor was she given opportunities to develop her independence. She wanted to learn how to play the saxophone; she learned how to play the trumpet in middle school. She knows how to cook and likes to make cube steak.

108. A mental health treatment professional has determined that E.E. was eligible for a community-based placement with appropriate services.

109. E.E. functioned adequately in a community-based placement and developed a good relationship with community providers before she was moved back to a PRTF, which suggested she was eligible for a supported, appropriate community-based placement if one existed.

110. E.E. brings this action through her next friend, Christine Freeman.

111. Ms. Freeman is familiar with the facts of E.E.'s case as well as the harms and risk of harm E.E. has suffered in DHR's custody. Ms. Freeman is dedicated to serving E.E.'s best interests in this litigation.

**F. Plaintiff F.F.**

112. F.F. is a 15-year-old white female with mental and physical impairments that substantially limit one or more major life activities. She has received several diagnoses, including Reactive Attachment Disorder, Oppositional Defiant Disorder, ADHD, Anxiety, and Depression. She has also suffered emotional and physical abuse.

113. DHR placed F.F. in a PRTF nearly two years ago, in June 2021, and she still resides there.

114. DHR removed F.F. from her mother's custody when she was seven years old.

115. F.F. has never met her three brothers, and last remembers seeing her sister about eight years ago, when police came and took her to another placement. She does not know where her siblings are and does not understand why she cannot speak with or see them.

116. During her eight years in DHR custody, F.F. has spent the majority of her life being shuffled among at least 25 placements, including nine residential placements, and at least three PRTFs.

117. For almost two years, F.F.'s daily life has been regimented and controlled by the PRTF where she resides. For example, she is only allotted eight minutes in the morning for bathroom time and twelve minutes at night—leaving her with little time to shower. In addition, she has limited choice over the clothes she wears. She is not allowed to go shopping; a DHR worker must shop for her and bring the clothes to her. Most of her clothes do not fit her and are not her style.

118.    At the PRTF, F.F.'s ability to progress in and exit from the placement hinges, in large measure, on her ability to advance through the program's "level system"—a one-size-fits-all behavior management system used by many PRTFs that is arbitrary, punitive, and non-therapeutic.

119.    F.F. is denied certain benefits and privileges because she has not moved within the level system. As a result, she is not allowed to leave the facility grounds. She cannot go out to the movies, the park, or get ice cream with other residents.

120.    F.F. does not think that the PRTF is helping her. She sees an individual therapist just once per week and is not able to see the therapist more often, even during difficult weeks. F.F. could receive these services in a community-based placement.

121.    DHR only places youth with mental impairments that substantially limit one or more major life activities in a PRTF. Thus, by placing F.F. in PRTFs, DHR regards her as such a youth.

122.    F.F. would like to leave the PRTF. She wants to live in the community in a family-like setting, but has been told that there are no other placements available for her.

123.    F.F. has been unnecessarily segregated from her community and non-disabled peers.

124.    At the PRTF, F.F. cannot engage in typical teenage activities and develop her independence.

125.    At the PRTF, F.F. is restricted from attending school in the community or engaging in any community-based hobbies or extracurricular activities.

126.    If she were not in a PRTF, F.F. would like to attend a football game. She "wants to go to a real school." F.F. also enjoys reading the Twilight novels and has a passion for video

games. She wants to be a video game developer, and she wants to create a video game that is non-violent and helps kids learn coping and basic living skills.

127.     A mental health professional has determined that F.F. is eligible for a less restrictive placement with appropriate services and supports.

128.     For example, F.F. would likely benefit from a clinical intervention that focuses on trauma, skill building within relationships, and peer support in the community as she ages into adulthood. She would also likely benefit from vocational and educational supports.

129.     F.F. brings this action through her next friend, Christine Freeman.

130.     Ms. Freeman is familiar with the facts of F.F.'s case as well as the harms and risk of harm F.F. has suffered while in DHR's custody. Ms. Freeman is dedicated to serving F.F.'s best interests in this litigation.

**G. Plaintiff G.G.**

131.     G.G. is a 14-year-old white female with a mental impairment that substantially limits one or more major life activities. She has received several diagnoses, including ADHD and PTSD. She is also the victim of sexual abuse.

132.     DHR placed G.G. in a PRTF almost one year ago, in April 2022, and G.G. still resides there.

133.     G.G. entered DHR custody when she was nine or ten years old.

134.     Throughout her five years in DHR custody, G.G. has been shuffled between multiple placements.

135.     G.G. has been confined to three PRTFs while in DHR custody—one for eleven months, another for five months, and her current PRTF placement, where she has lived for almost a year.

136. DHR only places youth with mental impairments that substantially limit one or more major life activities in a PRTF. Thus, by placing G.G. in PRTFs, DHR regards her as such a youth.

137. Throughout her childhood, G.G. has wanted to live with a family in the community. She wants to be an actress. She enjoys reading Harry Potter, watching television, and taking pictures.

138. G.G. wants to leave her PRTF. Her social worker has said that she has made enough progress through the program and should be placed in a less restrictive placement.

139. G.G. remains in an isolated and restricted PRTF where her life activities are extremely limited and regimented. Her placement restricts her from doing typical activities like other teenagers do to foster independence. She has limited choice over what clothes she can wear. The clothes she is made to wear are often not her style.

140. At the PRTF, G.G. is restricted from attending school in the community or engaging in any community-based hobbies or extracurricular activities

141. G.G.'s ability to leave her current PRTF placement has been contingent, in large part, on her ability to advance through the program's "level system,"—a one-size-fits-all behavior management system used by many PRTFs that is arbitrary, punitive, and non-therapeutic. G.G. feels that she "can't be [her]self here" and has been moved down a level "for being [her]self." G.G. has lost levels for minor behaviors such as "dancing with a broom while cleaning" and "being negative and petty."

142. A mental health professional has determined that G.G. is eligible for a less restrictive placement with appropriate services and supports.

143.     For example, G.G. would likely benefit from services and supports that provide vocational planning and daily living skills in the community, peer support, and community-based therapy.

144.     G.G. brings this action through her next friend, Christine Freeman.

145.     Ms. Freeman is familiar with the facts of G.G.'s case as well as the harms and risk of harm G.G. has suffered while in DHR's custody. Ms. Freeman is dedicated to serving G.G.'s best interests in this litigation.

## II.     Defendant Nancy T. Buckner, Commissioner of DHR

146.     Defendant Nancy T. Buckner has been the Commissioner of DHR since September 2008 and is sued in her official capacity.

147.     DHR is responsible for administering the child welfare system in Alabama and is the entity responsible for the care and custody of foster children, including each of the Plaintiffs and all members of the proposed Class.

148.     As Commissioner, Defendant Buckner is the chief executive and administrative officer of DHR. DHR's deputy commissioners report directly to the commissioner.

149.     Defendant Buckner controls DHR's child welfare policies and practices and is responsible for ensuring that DHR's programs comply with federal statutes and regulations. She oversees the DHR divisions responsible for providing child welfare services including its Children and Family Services Division, Quality Assurance Division, Resource Management Division, and Field Administration Division.

150.     Each of these divisions has responsibilities connected to ensuring that community-based placements and services are available for the youth who need them and that eligible youth in DHR's custody receive the services they need.

151. Defendant Buckner is ultimately responsible for supervising and monitoring PRTFs, ensuring the adequacy and availability of appropriate community-based placement for children in DHR's care, and ensuring that DHR effectively transitions children to community-based placements and services when it is appropriate. Defendant Buckner is also responsible for the procurement and allocation of available funds to foster homes, therapeutic foster homes, and other home-like, community-based settings and services.

## FACTUAL ALLEGATIONS

**I.** **DHR Segregates Foster Children with Mental Impairments in PRTFs Subjecting Them to Isolation and Harm.**

152. DHR has a policy or practice of inappropriately and unnecessarily segregating foster children with mental impairments in PRTFs.

153. All the children DHR places in PRTFs are children with disabilities, having been diagnosed with one or more mental impairments that substantially limit one or more major life activities. Thus, by placing children in a PRTF, DHR regards them as having a mental impairment that substantially limits one or more major life activities.

154. Many of these youth qualify for and could be served by placement in community-based settings like therapeutic foster homes or other appropriately supported family placements.

155. These children are inappropriately placed in segregated facilities because DHR has a policy or practice of failing to provide sufficient community-based placements and related supports and services.

156. Many of these children are forced to remain in these facilities far longer than their medical needs require because, in addition to failing to provide a lack of community-based resources, DHR systemically fails to ensure that youth are timely discharged when they are ready.

## A. PRTFs Are Segregated Facilities That Deprive Children of Healthy Childhood Experiences and Opportunities to Interact with Their Nondisabled Peers.

157. PRTFs are highly regimented and controlled facilities.

158. Youth confined to PRTFs are cut off from family and friends and have few opportunities to interact with anyone without a disability, other than staff.

159. Children in PRTFs attend school on site. They are not integrated with nondisabled peers.

160. Children in PRTFs are rarely afforded the option of participating in community-based activities, including recreation-league sports, dance classes, music lessons, part-time jobs, or school clubs.

161. The PRTF staff choose each child's roommates and where they sleep. Children generally share rooms with at least two others and have little designated personal space. Facility staff determine when children may shower and when children perform their daily hygiene. In many PRTFs, children must request permission to use the bathroom. They have little to no privacy.

162. Psychiatric care and therapy are provided by staff of the institution or by independent contractors hired by the PRTF. This care is overshadowed by rigid, non-individualized behavior management practices rather than the child's individual needs and goals.

163. Placement in these facilities prevents already traumatized children in foster care from forming meaningful relationships with "buffering" adults—trusted adults who serve to buffer and soothe a child's physiological stress responses—leading to toxic stress. Toxic stress is associated with physical effects on children's neural structures, compromised brain development and behavioral functioning, and related psychological adjustment problems. The availability of a positive and stable adult is one of the most important factors in promoting resilience in traumatized children, but residential settings impede the formation of secure attachments with adults.

164. Children placed in PRTFs experience worse outcomes than their non-institutionalized peers.

165. Social science research and evaluations of residential facilities and group homes have confirmed that youth placed in residential facilities spend more time in foster care overall, are less likely to be placed with their siblings, and are less likely to be placed in or near their home communities.

166. In addition, children placed in facilities are more likely to experience maltreatment in care.

167. Finally, children placed in these residential facilities are less likely to achieve permanency—a safe and legally permanent family—and therefore are more likely to "age out" of the foster care system without community-based supports to facilitate their successful transition to adulthood.

168. Because of these known harms, children should only be placed in PRTFs when they have intensive mental health needs that cannot be met in a well-supported, family-like setting and when they require short-term treatment that can only be delivered in a residential setting. And even then, such placements should be used only for as long as needed to stabilize the child so they can return to a family home.

169. Despite the well-documented harms caused by institutionalization, DHR continues to segregate and isolate hundreds of children and youth in foster care with mental impairments in PRTFs, denying them the opportunity to receive treatment in a loving and supportive home and mental health treatment in a community setting.

170. Confined to restrictive institutions, these children are denied experiences that children raised in the community enjoy. Their talents and interests remain largely unexplored.

They do not have a chance to find a first job or learn how to drive. And tragically, the gap between their development and that of their non-disabled peers grows larger each day DHR confines them unnecessarily in an institution.

**B. PRTFs in Alabama Are Not Monitored to Ensure They Are Safe.**

171.    Defendant fails to consistently monitor to ensure that PRTFs are safe places for children to live.

172.    There are numerous reports of staff at PRTFs slamming children against walls, punching and slapping children in the face, using chokeholds, and laying on top of children who are being held face down on the ground.

173.    Staff violence against youth at PRTFs has resulted in serious injuries, including head trauma, lacerations, hematomas, and loss of consciousness, as well as mental, behavioral, and emotional damage.

174.    Many PRTFs use or have used abusive seclusion practices and other forms of psychological punishment on children.

175.    Sequel Youth and Family Services ("Sequel") Tuskegee uses its "time-out room" to seclude youth for as many as 72 hours at a time. This room has no toilet or sink, forcing residents to bang on the door to get staff's attention to use the restroom. When children are unable to get staff members' attention, they have been forced to urinate in the corner of the room and clean it up later or urinate into a container if they have one.

176.    Sequel Owens Cross Roads facility staff have punished residents by forcing them to stay in a time-out room alone for extended periods of time, and in some cases overnight. In one instance reported to DHR, a girl was held in the time-out room for five days. In another, a girl was

forced to take her thin, plastic bed pad, place it in the barren time-out room, and sleep on the floor for four weeks.

177.     In addition to physical violence, many PRTFs have used psychologically damaging methods of control on their youth residents with mental impairments, like the "Group Ignorance" shunning program that A.A. was subjected to for almost a year.

178.     It is also common for youth in PRTFs to be subjected to dingy living conditions that can border on being squalid.

179.     Bedrooms have been found to contain broken bed frames and "mattresses" that consist of a slim plastic pad laying atop concrete slabs or wood. Children's bedrooms have dirty bedding, floors, and windows. Rooms have been dimly lit and walls barren. Blood and feces have been visible on the walls and floors.

II.     **DHR Unnecessarily Relies on PRTFs and Fails to Provide Integrated, Community-Based Settings for Children in Foster Care with Mental Impairments.**

     **A.  DHR Overuses Residential Facilities for Children in Foster Care.**

180.     DHR has a statutory obligation to develop and provide appropriate resources for the care of dependent, neglected, abused, and exploited children in Alabama. DHR's obligations include a responsibility to facilitate independence and self-determination, "consistent with [the youth's] capabilities and opportunities," for children in DHR's care.

181.     DHR's obligations also include "developing new resources" for the care of children in foster care as needed and "reevaluating, reapproving, or relicensing existing foster care resources."

182.     DHR also has a responsibility to identify the mental health needs of children in foster care and determine how to meet those needs.

183.    DHR is also responsible for supervising the county departments of human resources to ensure that they effectively administer and manage their foster care functions.

184.    DHR's regulations require that children be placed "in the least restrictive setting possible," which means "the most family-like setting that can provide the environment and services needed to serve the child's best interests and special needs."

185.    Nevertheless, public reporting and data shows that DHR overuses residential facilities (defined as group homes and institutions) for children in foster care —a fact which DHR admits. DHR acknowledges that it should "lessen [its] dependence on congregate care facilities" and "achieve permanency for these children through adoption."

186.    And at any given time, more children in foster care are placed in PRTFs in Alabama than in any other form of residential facility (which include group homes and so-called moderate residential facilities).

187.    As of DHR's 2021 federal reporting, fifty-two percent of all children and youth in foster care in Alabama's residential facilities are placed in PRTFs, or, as DHR refers to them, "Intensive" placements.

188.    DHR's practice of prioritizing residential facilities over family homes and other integrated community settings has a disproportionate impact on Black children in foster care.

189.    Forty-one percent of youth placed in residential facilities are Black even though Black children make up only 33.1% of Alabama's foster care population. Similarly, 39.4% of Black children in foster care with a diagnosed "emotional disturbance" are placed in residential facilities while only 31.6% of their non-Black peers with an emotional disturbance are placed in residential facilities.

**B. DHR Fails to Develop and Support a Sufficient Array of Family Homes and Integrated Community Settings.**

190. DHR unjustifiably places and maintains children in foster care in segregated PRTFs because it fails to fulfill its duty to adequately procure, support, and maintain family homes and integrated community settings.

191. In its annual reporting to the federal government in 2018, DHR admitted that it has long relied on institutional placements because it lacks sufficient community-based alternatives, noting that it needed to recruit and retain well-trained foster/adoptive resource families so that the state's "dependence on congregate care facilities" would decrease.

192. The following year, in 2019, DHR admitted "there is a statewide need for more foster/adoptive homes who are willing and able to meet the needs of children placed in their home throughout the life of the case. As it stands today, children are often placed based on availability of space rather than a true matching of strengths of a family with needs of a child."

193. In 2020, DHR again conceded to the federal government that it needed more resource families who can parent children with behavioral issues to "lessen [DHR's] dependence on congregate care facilities."

194. Diligent recruitment of foster parents is still an area the federal government identifies as "needing improvement" in DHR's child and family service plans.

195. And DHR admits that "matching children/youth in care with appropriate placement resources" is still a "challenge."

196. DHR also fails to provide adequate training and support to the foster families that do exist.

197. DHR admitted just last year that "foster families need more clinical skills training," including in areas of reactive attachment disorder and trauma.

198.    Statewide assessment and stakeholder interviews confirm that Alabama is not consistently ensuring "that requirements for continuing education for foster parents are applied equally across all jurisdictions."

199.    DHR has also publicly admitted to a "lack of clarity" regarding who is responsible for training staff to recruit foster families who are willing and able to address the special care needs of youth in care.

200.    When foster parents are not adequately trained and supported, the foster placement is more likely to fail, which often results in the children being moved to a PRTF.

201.    DHR has the framework for providing appropriate placements and services that would allow foster youth with mental impairments to live in the community, but DHR fails to adequately recruit, support, and invest in these placements and services to allow children in foster care to live in the community.

202.    DHR would not have to fundamentally alter any of its programs or services for DHR to develop or expand its array of programs and services to meet the needs of Alabama's children in foster care.

203.    For example, DHR employs therapeutic foster care homes and therapeutic foster care homes with enhanced services for some youth. DHR states that these programs "are essential components in the service array for emotionally or behaviorally disordered children and youth." These programs are specifically designed to serve children who might otherwise be placed in a residential setting due to treatment needs.

204.    DHR admits that "there are not sufficient [Therapeutic Foster Care] homes willing to accept and maintain older teens/young adults and children with more significant behavioral issues, so it is frequently difficult to locate stable placements for these children."

205.    Further, DHR has a program that ostensibly provides additional "difficulty of care payments" to foster homes serving "emotionally disturbed" children or children with "pronounced behavior problems." This program is supposed to enable more children with mental health needs to be placed with families in the community.

206.    But DHR's Monthly Statistical Reporting shows that almost no caregivers receive difficulty of care payments.

207.    In FY 2020, an average of only 16 children each month received difficulty of care payments (also called specialized service fees). In FY 2019, an average of only 11 caregivers received specialized services fees (each month); in FY 2018, the number was 13.

## C. DHR Fails to Develop and Support an Adequate Array of Community Based Support Services.

208.    DHR also fails to ensure that children in DHR's custody have adequate access to an appropriate array of providers to deliver sufficient community-based mental health services. As a result, DHR forces children to receive mental health treatment in more restrictive placements.

209.    In 2018, the Federal Children's Bureau found that Alabama "does not have an adequate array of services accessible to children and families statewide… Gaps and waitlists were identified for substance abuse treatment for both youth and adults, transportation, timely access to mental health services, inpatient crisis stabilization services, trauma-responsive services, and services to families providing kinship care."

210.    In 2020, information collected by DHR during interviews with stakeholders indicated Alabama's service array has not improved: "the state does not have an adequate array of services accessible to children and families statewide," especially in rural areas of the state. Gaps and waitlists were identified for timely access to mental health services and trauma-responsive services.

211.     DHR has the framework for providing necessary mental and behavioral health services in the community. Expanding the availability of community-based behavioral and mental health services would thus not require DHR to fundamentally alter its programs and services.

212.     There are, for example, mobile crisis and crisis stabilization services available for adults in Alabama.

213.     Mobile crisis and crisis stabilization services provide short-term emergency care in the home and often could mean the difference between a child remaining in the community or being placed in an intensive residential facility.

214.     DHR, however, fails to ensure that children in foster care have access to mobile crisis and crisis stabilization services.

215.     DHR similarly fails to ensure that children in foster care and foster families that support them have access to adequate respite care. Respite care is a resource that allows a foster family to temporarily place their foster child in the care of another family, allowing the primary caregiving family a break from its many responsibilities.

216.     Respite is an essential service that helps to prevent overwhelm of foster families, which in turn helps prevent placements from being unsuccessful and children ending up in a PRTF. Although DHR employs a respite care model to support some foster parents and therapeutic foster parents, the amount provided is wholly insufficient to meet the needs of the Plaintiff Class.

217.     There are programs throughout the state that provide community mental and behavioral health programs to some children in foster care.

218.     Rather than expanding these existing programs to support community-based placements for children in foster care, DHR continues its unlawful and discriminatory policy or practice of unnecessarily institutionalizing youth in segregated placements.

219. DHR's spending practices also reflect its policy or practice of institutionalizing youth with mental impairments who could be treated in the community.

220. DHR continues to spend taxpayer dollars on expensive, institutional placements instead of foster and relative care, which are significantly less expensive.

221. The cost of institutional care to agencies and taxpayers can be seven to ten times more expensive than caring for a child in a family setting.

222. By failing to invest in family foster homes, other integrated community settings, and community-based services and, instead, focusing funding on restrictive placements like PRTFs, DHR deprives children in foster care of the opportunity to receive treatment in family-like settings within their communities.

**D. DHR Fails to Ensure Children Who Are Qualified for Family Homes and Integrated Community Settings Are Timely Discharged from PRTFs.**

223. DHR's practices and policies discriminate against plaintiffs and similarly situated children, who have been or should be evaluated and "stepped down" to family homes and other integrated community settings, by subjecting them to continued, unjustified segregation in PRTFs.

224. DHR does not timely return children to the community once it has placed them in a PRTF.

225. Staff at PRTFs admit that children stay at facilities longer than necessary.

226. In 2019, staff at Mountain View PRTF admitted that children stay at Mountain View up to 6 months after they complete the program because of a lack of placements in the community.

227. Also in 2019, staff at Sequel Owens Cross Roads PRTF stated that once children complete the programs, they wait from several weeks to several months to move to a less restrictive placement.

228.    DHR permits PRTFs to utilize level systems to govern step-down.

229.    As described above, level systems are a one-size-fits-all behavior management system used by many PRTFs to measure a child's success within a treatment program based on the child's ability to follow a uniform set of rules.

230.    Completion of these levels—rather than the child's individual behavioral health needs and progress at achieving individually-set goals—are used to determine whether the child has "completed the program" and can be stepped down to a less restrictive placement.

231.    These level systems consist of punitive restrictions on basic freedoms that are completely unrelated to treatment needs.

232.    In some PRTFs, a team of staff decides "level promotions" each week.

233.    The staff assigns points to each type of "misbehavior," and levels or privileges may be suspended or dropped depending on the type of behavior shown.

234.    If a child misbehaves, his or her stay at the PRTF is automatically extended by a minimum of two weeks.

235.    Students on the higher levels at some PRTFs risk returning back to level one for minor infractions, including name calling, going barefoot, horse play, lending or borrowing clothes, and talking or playing while standing in line.

236.    These level programs turn typical and developmentally appropriate adolescent behavior into a reason to keep the child segregated in an institution, instead of focusing on whether the child's needs could best be met in the community.

237.    Level system infractions do not indicate that a child's needs must be met in institutions.

238. These level systems focus on compliance with rules, not improvement in the child's mental health.

239. DHR also fails to adequately plan for children to transition to community-based placements and services.

240. Even after "completing the program," children are often told by PRTF staff or their DHR caseworker that, although they are "ready to leave" the facility, DHR has no place for them to live. So they remain in the restrictive and segregated facilities, often for many months.

241. As the experiences of the Named Plaintiffs indicate, children can languish in PRTFs for years while waiting for a placement in an integrated setting.

242. DHR's failure to plan for transitions also sets youth up for failure when they are finally placed in community settings.

243. DHR places children with families without ensuring that the families have the training and support services that the children need.

244. The result is that those placements can quickly experience challenges and those children are re-institutionalized in another restrictive placement.

245. These practices and policies, along with DHR's failure to recruit, support, and invest in family homes and other integrated community settings unnecessarily segregates youth in foster care with mental impairments. This continued unnecessary institutionalization violates their right to community integration.

## CLASS ACTION ALLEGATIONS

246. Plaintiffs properly maintain this action as a class action under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of a class consisting of every youth who now or during the pendency of this action meets the following criteria:

The youth is adjudicated dependent under Ala. Code § 12-15-314(a)(3), has a mental health impairment that substantially limits one or more major life activities, is referred to, placed in, or at risk of placement in a PRTF (or, as DHR refers to these facilities, an "Intensive" facility), and who is or will be eligible for community-based placements or services.

247. **Numerosity.** The Class is sufficiently numerous to make joinder of all its members impracticable. Over 500 youth are placed by DHR in PRTFs at any given time. Hundreds more are at risk of being placed in these facilities.

248. The foster care and PRTF populations change frequently, making their joinder even more impracticable.

249. Joinder is also impracticable because Class members lack the knowledge and financial means to maintain individual actions.

250. **Commonality.** There are numerous questions of law and fact that are common to the Class. These questions include:

a. Whether Defendant has a policy or practice of failing to plan, develop, operate, and fund a sufficient number of family-like foster care settings for the Class.

b. Whether Defendant has a policy or practice of failing to plan, develop, operate, and fund a sufficient array of community-based support services for children in the child welfare system that would allow them to live in integrated settings.

c. Whether Defendant has a policy or practice of unjustifiably institutionalizing youth in the Class in PRTFs.

d. Whether Defendant's policies and practices with respect to the Class violate the ADA.

e. Whether Defendant's policies and practices with respect to the Class violate Section 504 of the RA.

251. **Typicality.** The claims of the Named Plaintiffs are typical of the claims of the Class. Each of these Plaintiffs is a member of the Class. Each is subject to the unlawful policies and practices identified in this complaint with respect to the Class. And each is entitled to the same injunctive and declarative relief that addresses these policies and practices.

252. **Adequacy of Representation.** Named Plaintiffs will fairly and adequately protect the interests of the Class. There are no conflicts of interest between Plaintiffs and the members of the Class that they seek to represent. The relief sought by the Named Plaintiffs will benefit all members of the Class.

253. Each of the Next Friends is dedicated to representing the best interests of the plaintiff or plaintiffs that he or she represents.

254. Plaintiffs' counsel are:

 a. Attorneys from Children's Rights, a non-profit advocacy organization with offices in New York and Atlanta;

 b. Attorneys from the Alabama Disabilities Advocacy Program, Alabama's federally mandated Protection and Advocacy agency; and

 c. Attorneys from the Southern Poverty Law Center, a non-profit civil rights organization with offices in Alabama, Florida, Georgia, Louisiana, Mississippi, and Washington, D.C.

255. These attorneys have extensive experience litigating complex class actions in federal court, especially with respect to institutional reform litigation on behalf of youth involved with child welfare systems. Plaintiffs' attorneys have committed sufficient resources to represent the Class.

256.    Plaintiffs' attorneys are thus well-suited to fairly and adequately represent the interests of the Class.

257.    As detailed throughout this complaint, Defendant acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive and declaratory relief appropriate with respect to the Class as a whole under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## First Cause of Action
### (Discrimination in Violation of the ADA, 42 U.S.C. §§ 12101 *et seq.*)

258.    Plaintiffs incorporate each and every allegation in this complaint as if fully set forth here.

259.    Plaintiffs bring this cause of action on behalf of the Class against Defendant Buckner in her official capacity.

260.    Each Plaintiff and Class member has a mental impairment that substantially limits one or more major life activities, has a record of such impairment, or is regarded by DHR as having such an impairment. Each, therefore, has a disability as defined by the ADA, 42 U.S.C. § 12102, and its implementing regulations, 28 C.F.R. § 35.108.

261.    Plaintiffs and Class members are "[q]ualified individuals with disabilities" as defined by the ADA, 42 U.S.C. § 12131, and its implementing regulations, 28 C.F.R. § 35.104.

262.    DHR is a public entity covered by Title II of the ADA. *See* 42 U.S.C. § 12131(1)(B). Defendant, acting in her official capacity, is a public entity as defined by the ADA, 42 U.S.C. § 12131, and its implementing regulations, 28 C.F.R. § 35.104. As such, the ADA prohibits Defendant and DHR from discriminating against individuals with disabilities in its programs and services. *See* 42 U.S.C. §12132. And the unjustified segregation of individuals with disabilities constitutes unlawful discrimination under Title II of the ADA. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999).

263.	The ADA's implementing regulations require that a public entity "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Further, "a public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration [that] have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3)(i).

264.	Defendant's policies and practices have caused the Plaintiffs and all Class members to be unnecessarily confined in PRTFs rather than integrated settings in the community. These policies and practices include but are not limited to:

a.	Failing to plan, develop, operate, and fund a sufficient number of family-like foster care settings for Plaintiffs and Class members,

b.	Failing to plan, develop, operate, and fund a sufficient array of community-based support services for Plaintiffs and Class members that would allow them to live in integrated settings, and

c.	Unjustifiably institutionalizing Plaintiffs and Class members in PRTFs.

265.	As a direct and proximate result of these policies and practices, Plaintiffs and Class members are unjustifiably segregated or at serious risk of segregation in dangerous institutional settings, in violation of Title II of the ADA.

266.	By failing to make reasonable modifications to the policies, practices, or procedures governing the provision of foster care services in Alabama to ensure they are provided in the most integrated setting appropriate to the needs of children, Defendant discriminates against Plaintiffs and Class members because of their disabilities, in violation of Title II of the ADA, 42 U.S.C. §§ 12132 *et seq.*, and its implementing regulations, 28 C.F.R. § 35.130.

267. By requiring Plaintiffs and Class members to live in restrictive institutions without justification, Defendant unlawfully fails to administer Alabama's child welfare program in the most integrated settings appropriate to Plaintiffs' and Class members' needs. *See* 28 C.F.R. § 35.130(d).

268. Plaintiffs and Class members are injured by Defendant's actions and omissions.

## Second Cause of Action
**(Discrimination in Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794)**

269. Plaintiffs incorporate each and every allegation in this complaint as if fully set forth here.

270. Plaintiffs bring this cause of action on behalf of the Class against Defendant Buckner in her official capacity.

271. Each Plaintiff and Class member has a mental impairment that substantially limits one or more major life activities, has a record of such impairment, or is regarded by DHR as having such an impairment. Each therefore has a disability as defined by the Rehabilitation Act. *See* 29 U.S.C. § 705(20)(B) (citing to the ADA's definition at 42 U.S.C. § 12102). Plaintiffs and Class members are "qualified individuals with disabilit[ies]" as defined by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and its implementing regulations, 28 C.F.R. § 41.51.

272. DHR is a governmental agency that receives federal financial assistance and operates programs or activities within the meaning of Section 504. *See* 29 U.S.C. § 794(b)(1)(A). Defendant, acting in her official capacity, is a public entity as defined by the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations, 28 C.F.R. § 41.51. As such, the Rehabilitation Act prohibits Defendant and DHR from discriminating against individuals with disabilities in their programs and services. *See* 29 U.S.C. § 794(a). And the unjustified segregation of individuals with

disabilities constitutes unlawful discrimination under Title II of the ADA. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999); *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cty.*, 610 F.3d 588, 604 (11th Cir. 2010).

273.    Regulations implementing Section 504 require that recipients of federal funds like DHR administer their programs and activities in "the most integrated setting appropriate to the needs" of qualified individuals. 28 C.F.R. § 41.51(d). Further, recipients of federal funds may not, directly or through contractual or other arrangements, "utilize criteria or methods of administration [that] have the effect of subjecting qualified handicapped persons to discrimination of the basis of handicap." 28 C.F.R. § 41.51(b)(3)(i); *see also* 28 C.F.R. § 41.31(a) (defining "handicapped person" as "any person who has a physical or mental impairment that substantially limits one or more major life activities").

274.    Defendant's policies and practices have caused the Named Plaintiffs and all Class members to be unnecessarily confined in PRTFs rather than integrated settings in the community. These policies and practices include but are not limited to:

      a.    Failing to plan, develop, operate, and fund a sufficient number of family-like foster care settings for Plaintiffs and Class members,

      b.    Failing to plan, develop, operate, and fund a sufficient array of community-based support services for Plaintiffs and Class members that would allow them to live in integrated settings, and

      c.    Unjustifiably institutionalizing Plaintiffs and Class members in PRTFs.

275.    As a direct and proximate result of these policies and practices, Plaintiffs and Class members are unjustifiably segregated or at serious risk of segregation in dangerous institutional

settings, in violation of Section 504 of the RA, 29 U.S.C. § 794, and its implementing regulations, 28 C.F.R. § 41.51.

276.    By failing to make reasonable modifications to the policies, practices, or procedures governing the provision of foster care services in Alabama to ensure they are provided in the most integrated setting appropriate to the needs of children, Defendant discriminates against Plaintiffs and Class members because of their disabilities, in violation of Section 504 of the RA, 29 U.S.C. § 794, and its implementing regulations, 28 C.F.R. § 41.51.

277.    By requiring Plaintiffs and Class members to live in restrictive institutions without justification, Defendant unlawfully fails to administer Alabama's child welfare program in the most integrated settings appropriate to Plaintiffs' needs. *See* 28 C.F.R. § 41.51.

278.    Plaintiffs and Class members are injured by Defendant's actions and omissions.

### Prayer for Relief

**THEREFORE**, Plaintiffs respectfully request that the Court:

A.    Assert jurisdiction over this action;

B.    Certify the Class pursuant to Fed. R. Civ. P. 23;

C.    Award prospective injunctive relief requiring Defendant to develop and sustain sufficient capacity of community-based placements and services to meet the needs of Alabama's children in foster care with mental impairments, and to implement and sustain an effective system for transitioning youth in foster care with mental impairments to integrated settings in the community;

D.    Declare unlawful pursuant to Fed. R. Civ. P. 57: Policies, procedures, and practices that violate Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* and Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794, *et seq.*;

E.     Award Plaintiffs the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees; and

F.     Grant such other further and equitable relief as the Court deems just, necessary, and proper to protect Plaintiffs from further harm.

Dated: May 8, 2023

Respectfully Submitted,
**ALABAMA DISABILITIES ADVOCACY PROGRAM**

/s/ Andrea J. Mixson
Andrea J. Mixson
Ala. Bar No. ASB 2155-R79M
Nancy Anderson
Ala. Bar No. ASB 3738-R67N
Larry Canada
Ala. Bar No. ASB 3153-N73L
2008 12th Street
Tuscaloosa, AL 35401
(205) 348-4928
amixson@adap.ua.edu
nanderson@adap.ua.edu
lcanada@adap.ua.edu

**SOUTHERN POVERTY LAW CENTER**

/s/ Michael Tafelski
Michael Tafelski
Ala. Bar No. ASB 4400A33A
Claire Sherburne
Ala. Bar No. ASB 1121A61H
Sophia Mire Hill (admitted *pro hac vice*)
La. Bar No. 36912
400 Washington Ave.
Montgomery, AL 36104
(888) 414-7752
michael.tafelski@splcenter.org
claire.sherburne@splcenter.org
sophia.mire@splcenter.org

**CHILDREN'S RIGHTS**

/s/ Aaron Finch
Aaron Finch (admitted *pro hac vice*)

NY Bar No. 5140033
Lindsey Frye (admitted *pro hac vice*)
NC Bar No. 47752
Katrina Braun (admitted *pro hac vice*)
NC Bar No. 53396
88 Pine Street, Suite 800
New York, New York 10005
(212) 683-2210
(212) 683-4015 (fax)
afinch@childrensrights.org
lfrye@childrensirghts.org
kbraun@childrensrights.org
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that I have on this day filed the foregoing document with the clerk of the court and electronically served the following persons:

Felicia M. Brooks
Jonathan S. Schlenker
Joshua L. Lane
Office of the Attorney General
Felicia.brooks@dhr.alabama.gov
Jonathan.schlenker@dhr.alabama.gov
Josh.lane@dhr.alabama.gov
Attorneys for Defendant

Alfred H. Smith, Jr.
Elizabeth N. Terenzi
Bainbridge, Mims, Rogers & Smith, LLP
asmith@bainbridgemims.com
bterenzi@bainbridgemims.com
Attorneys for Defendant

Dated: May 8, 2023

/s/ Aaron Finch
Attorneys for Plaintiffs